## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALFREDA D. MILLET
9803 Angora Drive
Cheltenham, MD 20623
(301) 466-3926 – Cell
(301) 782-7725 - Home

*Plaintiff*

vs.

UNITED STATES DEPARTMENT OF
THE TREASURY
STEVEN T. MNUCHIN
SECRETARY OF THE TREASURY
1500 Pennsylvania Ave
Washington, DC 20220

*and*

WILLIAM H. MAGLIN
Associate Chief Financial Officer
Office of the Chief Financial Officer
77 K Street NE
Washington, DC 20001

GINA JONES
77 K Street NE
Washington, DC 20001

*Defendants.*

Case: 1:19-cv-01244 (JURY DEMAND)
Assigned To : Jackson, Ketanji Brown
Assign. Date : 4/29/2019
Description: Employment Discrimination (H-DECK)

Jury Trial Demanded

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Non-Prisoner Complaint)

This is a lawsuit to remedy the outrageous and pervasive rampant practice of discrimination,

harassment (non-Sexual), retaliation, and related abuses that Plaintiff Alfreda D. Millet ("Ms.

Millet") has suffered at the hands of management for at least the past seven (7) years during her

1

harassment. These violations are systemic in nature constituting a custom or policy of

harassment and retaliation that has occurred for years and continues to the present day.

Accordingly, Ms. Millet seeks declaratory, equitable, and monetary relief.

## II. JURISDICTION AND VENUE

2.     This Court has subject matter Jurisdiction over all Counts because they arise under the

United States Constitution and federal statutes pursuant to 42 U.S.C. 2000e-5(f) and 2000e-

16(c). This court has jurisdiction to grant a declaratory judgment which is conferred by 28

U.S.C. §§ 2201-02.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because all the events or

omissions giving rise to Ms. Millet's claims occurred in the District of Columbia.

## III. THE PARTIES TO THIS COMPLAINT

4.     Alfreda D. Millet is a Black female at the CFO. She resides in Maryland. She is

presently employed as a Financial Management Analyst, GS-501-14 in the Government Payables

and Funds Management branch, duty stationed in Washington, DC. Her current first-level

supervisor is Barbara Akers, Supervisory Accountant. She has been her supervisor since May 13,

2018 and is not a party to this complaint. The matters about which Ms. Millet is complaining

about began during the period when Ms. Jones was her supervisor. Ms. Millet has been an IRS

employee since 1982 and have been a CFO employee since 2007 where she had been assigned to

the Financial Management Policy Office ("Policy Office") until May 12, 2018.

5.     Defendant Steven T Mnuchin, United States Secretary of the Treasury has been

designated to receive such complaint on behalf of the Department of the Treasury. The United

States Treasury is an executive department. Ms. Millet is bringing this complaint against the

agency in its official capacity.

6.     Defendant William H. Maglin is the Associate Chief Financial Officer for Financial Management. His office is responsible for delivering sound financial management through proper accounting and timely reporting of appropriated funds and custodial activities. Defendant Maglin has more than 50 contractors and 250 IRS employees working under his leadership. Ms. Millet is bringing this complaint against Defendant Maglin in his individual and official capacity.

7.     Defendant Gina Jones, Supervisory Accountant for the Policy Office during the period this complaint covers. Ms. Millet is bringing this complaint against Defendant Jones in her individual and official capacity.

## IV EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.     Ms. Millet timely filed informal complaints on March 22, 2013 and June 17, 2014 and formal complaints on May 3, 2013 and July 25, 2014. The 2013 and 2014 complaints were combined and as such the agency issued its final agency decision on January 4, 2018. However due the government shutdown, Ms. Millet did not receive the agency's final decision until January 28, 2019. No appeals have been filed on the two complaints.

## V. STATEMENT OF FACTS

9.     Ms. Millet has worked in positions of public trust and the federal government for more than thirty-seven (37) years, including for other departments within the IRS. Ms. Millet is a strong performer who rose through the ranks at the Agency due to her hard work and stellar performance, exhibited over several decades. In her first 30 years of service, Ms. Millet worked in IRS Taxpayer Service Division, in its Examinations Division, in its Tax Exempt and Governmental Entities Division. She enjoyed all her experiences and the chance to build productive relationships with her coworkers. She has never broken any federal laws, local laws

or IRS policies yet she has suffered discrimination based on her race (Black), disparate

treatment, retaliation and the terms and conditions of her employment has been altered.

10.    From 2007 to present, Defendant Maglin was Ms. Millet's second level direct

supervisor. As such Defendant Maglin had authority to approve her annual commitments and

work assignments; approve her performance rating; and the authority to discipline or terminate

her.

11.    From 2012 to May 12, 2018, Defendant Jones was Ms. Millet's first level direct

supervisor. As such Defendant Jones had authority to assign Ms. Millet work; approve her leave;

evaluate her performance; and make a recommendation to discipline or terminate her.

### A. Plaintiff's Distinguished Service with the Federal Government

12.    Ms. Millet began her career with the IRS on January 26, 1982 after working as a file

clerk and keypunch operator prior to joining the Agency. Ms. Millet started with the Agency

possessing only a high school diploma. She initially worked as a Clerk/Secretary from about

1982 to about 1987.  Ms. Millet also enrolled herself in Rutgers The State University in

September 1984, attending night classes to pursue her degree in Accounting. Ms. Millet's hard

work did not go unnoticed as she earned her first technical position in 1987 as a Taxpayer

Service Representative due to her excellent job performance. Ms. Millet continued to receive

promotions based on her stellar work ethic, as she soon began working as a Taxpayer Service

Specialist in 1989 and then received a promotion to Auditor in 1994. Ms. Millet also completed

her bachelor's degree in Accounting and graduated from Rutgers' School of Management, and

again received a promotion at the IRS to Internal Revenue Agent in 2000. She joined the CFO

Organization in September 2007, through another promotion, as its Financial Management

Analyst, the position she holds today. Ms. Millet achieved all these occupational and academic goals while raising twin children.

## V. FACTUAL ALLEGATIONS

13.   Ms. Millet believed she had been hired into a bargaining unit (BU) position. However, after Ms. Millet was hired into this position in or about September 2007. She learned from her then manager Serva Borum in or about October that she was classified as a non-bargaining unit (NBU) employee. Ms. Millet questioned Ms. Borum about what a NBU classification status meant as she had no idea since she had always been a BU employee from the moment she was employed by the Agency until she began working in the CFO organization. Ms. Borum was not sure what to tell Ms. Millet, so she took the issue to Defendant Maglin for an explanation on Ms. Millet's behalf. Defendant Maglin told Ms. Borum that the CFO made a mistake in posting the vacancy announcement as a BU position.  Ms. Millet took her NBU issue to NTEU President, Calvin Pollard for a possible resolution. Mr. Pollard told Ms. Millet that the majority of all GS-13 and GS-14 employees in the CFO are classified as NBU managerial officials even though those employees, including Ms. Millet, have no managerial responsibilities and no employees who reported to them. Ms. Millet accepted Mr. Pollard's explanation because he was NTEU's president. In or about September 2009 (Black Female) Tonya Alford was hired by the CFO organization. She worked in Ms. Millet's office as a GS-14 Financial Management Analyst. She was a BU employee. But two months after she hired (White female) Kathleen Downs, Ms. Millet and Ms. Alford's supervisor, told Ms. Alford that the position she applied for was no longer a BU position and that she was a NBU managerial official because a mistake had been made when the position was announced. She was devasted. She actively looked for other BU positions and subsequently left the CFO organization to work for another business unit. Ms. Millet believed

two mistakes had been made based on Mr. Pollard's explanation that almost all GS-13 and GS-14 employees in the CFO were NBU managerial officials.

14.     In or about March 2, 2010 Ms. Millet met with Ms. Downs and Defendant Maglin to complain about one of her team members (White female), Angela Leroux's unprofessional behavior and harassment actions towards her during their March 1, 2010 meeting with Ms. Downs also in attendance to address Ms. Leroux's concerns about Ms. Millet's feedback of her IRM that she had reviewed. It was Ms. Leroux's first review. Ms. Leroux was not pleased with the feedback, so she had been secretly meeting with Ms. Downs about the feedback for a about a week before Ms. Millet realized what was going on behind her back. Ms. Millet met with Ms. Downs and Ms. Leroux hoping to resolve Ms. Leroux's concerns and or issues. Two minutes into the meeting discussion Ms. Leroux started behaving unprofessionally. She became loud and hostile towards Ms. Millet expressing how she felt about the feedback that she had received from her. She was very aggressive and extremely agitated to the point that Ms. Millet felt unsafe. Ms. Downs did nothing to diffuse the situation even at Millet's request that she make her stop. Ms. Millet took the issue to Defendant Maglin for resolution. But when it became apparent to Ms. Millet that Defendant Maglin was not going to resolve or investigate the matter Ms. Millet requested of him to be reassigned out of the CFO organization because she no longer felt safe. Defendant Maglin claimed he considered Ms. Millet's request but instead demoted her claiming that other employees in her group had complaints about her and that they felt disrespected and intimidated by her when in fact there was no truth to it. Ms. Millet soon found out when she questioned both named employees Ms. Alford and (White Male) Walt MacDermid about what they supposedly said. Both employees denied making the allegation. Ms. Millet could not understand why she was being demoted especially since it was her who brought the issue of Ms.

Leroux's unprofessional behavior to Defendant Maglin. On March 19, 2010 Ms. Millet's duties changed to lower-graded duties. She was responsible for the same type of work assignments as her GS-13 former team members i.e., writing IMDs (IRMs, Delegation Orders, and SOP's). She was also tasked with assisting them with drafting their assigned IRMs. The demotion did not impact Ms. Millet's grade or pay thus she remained a GS-14 NBU management official. Prior to April 2010 Ms. Millet's primary responsibility was the lead the Accounting Policy team and the Travel team in the drafting and revising of Internal Revenue Manuals ("IRM"), Delegation Orders (DO) and Delegations of Authority.

15.     On March 19, 2010 Millet requested to be reassigned due to the demotion. Maglin denied Millet's request claiming that he attempted to find a temporary detail, which was not what Millet requested, with the hopes that the assignment would lead to a permanent position but Maglin provided no evidence of what he claimed.

16.     From September to November 2012, Ms. Millet requested telework on a recurring basis since this was now what many of the CFO's employees were doing. Despite Ms. Millet's efforts, her requests were denied. No explanation was given. Defendant Maglin would only authorize Defendant Jones to approve telework on an *ad hoc* basis with *a caveat* that Ms. Millet provide a line by line accountability of what she worked on while teleworking and account for the time she spent working on each assignment. This type of situation went on for more than two (2) months. When Ms. Millet followed the chain of command procedures in requesting to meet with (White Female) CFO, Pamela LaRue to discuss her issue Defendants Jones and Maglin met with Ms. Millet on November 5, 2012 to address her concerns with the telework issue. Both defendants were aware that Ms. Millet had a November 15, 2012 meeting with Ms. LaRue.   Before Ms. Millet finally met with Ms. Larue on November 15, 2012 to address the demotion and the fact

8

she had been harassed by Defendants Jones and Maglin, her telework issue was resolved. Ms. Millet had been approved to telework on a recurring basis. The reason given to Ms. Millet was that the collective bargaining unit agreement that addressed telework on a recurring basis applied only to BU employees and that they (Defendants Jones and Maglin) needed to make sure it had been passed through to NBU employees such as Ms. Millet which they learned had happened in October 2012 yet Ms. Millet's request to telework on a recurring basis continued to be denied for another month. Ms. Millet did meet with Ms. LaRue on November 15, 2012 about her issues. Ms. LaRue appeared receptive and friendly towards her as she listened to what Ms. Millet had to tell her. She promised Ms. Millet she would investigate the matter and get back to her after the holiday. A follow-up meeting was scheduled for November 27, 2012. Before leaving Ms. LaRue's office, she hugged Ms. Millet goodbye. When Ms. Millet met with Ms. LaRue on November 27 right away she could tell her attitude towards her was far less friendly than it had been on November 15. Ms. Larue told Ms. Millet that no comparable GS-14 BU position could be found and that she would remain in her current unit as a NBU employee with Defendant Jones as her manager. Ms. LaRue also told Ms. Millet that she had discussed her demotion and harassment issues with Defendant Maglin but provided no resolution.

17.    On November 15, 2012, Millet requested to be reassigned a second time due to Jones and Maglin's harassment over telework.  Maglin again refused to reassign Millet.

18.    Immediately after Ms. Millet reported the demotion and being harassed to Ms. LaRue she noticed a change in Defendant Jones behavior. She was hostile in the way she communicated to Ms. Millet. She began increasing her inventory adding additional responsibilities outside her annual commitments and outside her job description. From December 2012 until September 30, 2013 Defendants Jones (with Defendant Maglin's approval) assigned Ms. Millet more than ten

(10) additional assignments. When Ms. Millet questioned Defendant Jones as to why she was receiving additional assignments, she was told the additional assignments were *ad hoc* short assignments. As a matter of record one of the assignments took the work of more than 25 employees to complete. Ms. Millet received reassigned work from two co-workers (White Female) Joan Wyman GS-13 Financial Management Analyst; and Mr. MacDermid GS-13. Defendant Jones told Ms. Millet that she received work from Ms. Wyman because she was retiring at the end of the fiscal year and that Ms. Millet would be responsible for her debt collection program even though Ms. Millet had no background or experience in debt collection. Ms. Millet worked with income taxes for more than twenty (20) years before she was hired by the CFO organization. Defendant Jones provided no explanation for why Ms. Millet received reassigned work from Mr. MacDermid. Ms. Millet was also responsible for organizing a working group; developing and delivering training to her co-workers on a bi-weekly basis for three (3) months; and assisting other employees outside her unit with their work assignments even though she had no prior experience in those areas either. The additional other duties Defendant Jones assigned Ms. Millet made up more than 75% of her overall inventory. According to the record, Ms. Millet had the largest inventory of assignments than every employee in her unit.

19.   On December 18, 2012, Defendant Jones assigned Ms. Millet the responsibility to review and edit an IRM that was from another FM group. When Millet pointed this out to Defendant Jones she threatened to discipline her if she did not perform the work.

20.   On January 4, 2013, Defendant Jones directed Ms. Millet to review the work of another office work that was outside her job duties and responsibilities. Ms. Millet reviewed the work.

21.     On February 15, 2013, Defendant Jones refused to extend a deadline for a work product after she had assigned Ms. Millet additional work, in an attempt to impede her work performance.

22.     In or about February 2013 Francine Schlak of the Workforce Diversity and Inclusion Office contacted Ms. Millet to see if her office could offer her any assistance. She told Ms. Millet that she had several conversations with NTEU President Calvin Pollard and he had shared with her the telework issues and other issues Ms. Millet dealing with at the time and wanted to offer her assistance. Ms. Millet told Ms. Schlak about the switch in her position classification status from BU to NBU, the demotion and the harassment behind her telework issue. After hearing the details about the BU to NBU switch, concluded that the Agency violated federal employment laws. She also told Ms. Millet that she had been demoted which Ms. Millet did not believe at first until she spoke with an outside attorney who confirmed what Ms. Schlak told her about being demoted and that she had been discriminated against when Ms. Millet learned and told her that in February 2013 that her coworker (White Female) Patricia Self sent her an email confirming that she had been approved to telework on a recurring basis. It was at this point where Ms. Millet learned that the Agency committed a violation when her position as a Financial Management Analyst was changed from a BU to NBU managerial official position.   Thus, it was not until February 2013 that Millet developed a reasonable suspicion that she had been discriminated against. Ms. Schlak encouraged Ms. Millet to initiate an EEO complaint thus Ms. Millet contacted the EEO office and initiated a complaint on March 11, 2013 alleging race discrimination. The matters causing the complaint was Assignment of Duties; Demotion; Duty hours; Harassment (Non-sexual); Promotion; Reassignment Denied; Term/Condition of Employment; and Training. On March 22, 2013 Ms. Millet filed an informal complaint. On or

11

about March 22, 2013 Defendants Jones and Maglin was made aware that Ms. Millet sought

EEO counseling and that she had initiated a pre-complaint. She named them as violators of Title

VII of the Civil Rights Act of 1964.

23.    Defendant Maglin's office did not inform Ms. Millet or other CFO employees about a

vacancy announcement for a GS-15 in her in the Policy Office where she worked. Ms. Millet

was the only GS-14 employee permanently assigned to Defendant Jones and met the job

qualifications.  Ms. Millet did not find out about the vacancy until Defendant Jones announced at

her staff meeting in or about March 2013. Defendant Jones told her staff that her former (White

Female) Travel and Training manager Chris Scott, who left the IRS eight months earlier to work

for GSA, was selected for the recently closed (two or three weeks earlier) GS-15 Financial

Analyst position that had been announced sometime in February 2013.  Defendant Jones told her

staff that Defendant Maglin needed someone to handle the Event Spending Initiative and then

stated that the work would not keep Ms. Scott busy for long and that she would have to find

something else for her to do to fill in her workday.  The position was announced was the only

way Ms. hat Scott could apply. The position was open for only five days instead of the usual 10.

Unlike the standard past practice, Maglin's executive assistant Anita Davis, did not send out a

notification email to all CFO employees informing them that the position was open. The position

had been established years earlier but had not been filled until April 2013. Even though

Defendant Maglin claimed the position was posted on USA Jobs and anyone could apply, he

knew when he made the statement that he had already preselected Ms. Scott by his own

admission when he stated in his EEO declaration, that Millet incorporate by reference, that "he

believed no current staff (of approximately 300 employees)  had the requisite level of experience

and expertise to handle the extreme amount of work that existed and thus no e-mail was sent

internally to employees to inform them of the vacancy." Defendant Maglin's (Black Female) secretary shared with Ms. Millet in or about February 2013, that she answered the telephone when Ms. Scott called Defendant Maglin's office that day in February 2013 inquiring about possible job openings in the CFO. She shared with me that initially Ms. Scott requested to speak to Defendant Maglin, but he was not in the office so Ms. Taylor suggested that she speak with (White Female) Anita Davis Defendant Maglin's Executive Assistant as she was the acting manager for Defendant Maglin that day. She overheard Ms. Davis telling Ms. Scott to contact Defendant Maglin about vacancies in Financial Management. A day or two later, Ms. Scott called back she said and that she had spoken to her. Ms. Taylor told Ms. Millet Ms. Scott requested to speak to Defendant Maglin and the call was transferred to him. In April 2013 Ms. Scott was back in our office. Ms. Scott took over the event spending program, which had been operating for at least four months before she was hired. Ms. Scott oversaw the program for about a year and then the duties of the event spending program were transferred to Beckley Finance Center to be carried out by lower-graded employees. Ms. Millet was harmed by Defendant Maglin's action. She was not given the opportunity to openly apply for the position and compete for it.

24.    On March 11, 2013, Millet met with Maglin to discuss the possibility of being reassigned due to the mounting stress, loss of job security, humiliation and the disparate treatment concerning Millet's inventory. Maglin denied Millet's request for the third time citing the office had a lot of work.

25.    On March 15, 2013 Defendant Jones sent Ms. Millet an e-mail instructing her to report to the office on Tuesday March 19, 2013 to attend a scheduled meeting with her so that she could go over the status of Ms. Millet's work assignments. March 19 was Ms. Millet's regularly

scheduled telework day. Ms. Millet questioned the need to meet with Defendant Jones on

Tuesday March 19 since she was in the office every Thursday and felt that the status could be

presented then. On March 19, 2013 Ms. Millet reported to the office where she met with

Defendant Jones. They discussed her work assignments and the possibility of Ms. Millet

completing an IDP even though Ms. Millet repeatedly told Defendant Jones that she was not

interested in completing an IDP because she wanted to be reassigned out of the CFO

organization because she did not like her assignments and that she was unhappy and tired of

being harassed by her and Defendant Maglin. However, Defendant Jones continued to harass Ms.

Millet about an IDP concluding that Ms. Millet's statement that she was not a subject matter

expert was her reason for harassing her about an IDP as this would be the tool she would use to

find training for Ms. Millet which was not the case at all but just a pretext to her harassment.

26.     On April 25, 2013, Millet met with Jones to discuss and receive her mid-year

performance review. At Ms. Millet's request, her co-worker (Black Female) Angela Cook was

present to observe since Defendant Jones had already accused Ms. Millet of pointing her fingers

in her face in or about November 2012 when in fact Ms. Millet did no such thing. Even though

Defendant Jones apologized for the accusation shortly after making the statement, Ms. Millet no

longer trusted her or her intentions.  As suspected because of her reporting harassment issues to

Ms. LaRue on November 15, 2012 and because she met with the TIGTA Agent on May 7 Ms.

Millet review contained inaccurate and negative narratives.  She did not receive credit for many

of the assignments that she had completed up to mid-year. For example, Ms. Millet did not

receive credit for assisting the Revenue Accounting Office and the Financial Statement Office

with their assigned IRMs even though she mentioned them in her self-assessment. When Ms.

Millet pointed out to Defendant Jones that the performance review contained false and inaccurate

information she became upset at Ms. Millet and disciplined her for it on May 7, 2013 even though Ms. Millet's behavior remained professional during the entire April 25 meeting. Ms. Millet asked Ms. Cook if she would provide a write-up of what she observed soon after the meeting ended but she never did. Looking through the EEO records Ms. Millet discovered that Ms. Cook submitted a write-up of what she observed during the meeting to Defendant Jones.

27.   On April 25, 2013 during the mid-year meeting with Defendant Jones Ms. Millet was given IRM packaging instructions that were inconsistent with the IRS IMD IRM packaging procedures. Ms. Millet shared this fact with Defendant Jones and shared with her that she had verified the correct IRM packaging procedures with the two IMD coordinators Ms. Wyman and Cynthia Carver that were both her employees and Ms. Millet's work friends. On May 6, 2013 Defendant Jones sent Ms. Millet a meeting invitation to attend a mandatory meeting with her to discuss miscellaneous topics, per the invitation subject line on May 7. It was Ms. Millet's regularly scheduled telework day.

28.   On May 7, 2013, Ms. Millet was fed up with Defendant Jones constant harassment about her completing an IDP even though she told Defendant Jones she was not interested in completing one on February 5 and March 19, 2013 that she had become so distraught that she broke down crying in the office and had to be ushered into a nearby empty office by her coworker Angela Cook until she calmed down. Ms. Millet contacted the Treasury Inspector General for Tax Administration (TIGTA) about the IDP harassment matter. The Agent Ms. Millet spoke with ordered her to leave the office right away and meet with her at her office location. Before leaving the office, Ms. Millet stopped by Defendant Jones' office to let her know where she was going. She also sent her an email confirming what she told Defendant Jones and promised to contact her to let her know if she would be returning to the office or not.

15

Just as Ms. Millet sat down to discuss the harassment she had been experiencing with Defendants Jones and Maglin, the Agent's telephone rang, and she answered it. Ms. Winfree-Daniels was on the other end of the line. Ms. Millet could hear her speaking and recognized it was her. Ms. Winfree- Daniels wanted to know verify Ms. Millet's attendance and requested of her that she contact her to let her know when Ms. Millet left. Ms. Millet discussed with the Agent about Defendant Jones and Maglin constant harassment and wanted to know if TIGTA could intervene somehow to order them to cease their harassment but was told there was nothing her office could do. After the meeting with the Agent ended, Ms. Millet traveled back to the office.

29.     Later in the afternoon on May 7, Ms. Millet met with Defendant Jones' at her office. She discovered when she walked into Defendant Jones' office that her coworker Ms. Scott was in the room where she sat in the corner of Defendant Jones' office. Ms. Millet questioned the need for Ms. Scott's presence and requested that she not be present at the meeting. Defendant Jones told Ms. Millet that she wanted Ms. Scott to be there.  She then closed her office door behind Ms. Millet and the meeting began almost immediately. Defendant Jones opened the meeting with a statement "I'm going to make this as painless as possible." Jones mentioned a few things about Ms. Millet's work assignment and then went into the real reason she required Ms. Millet to meet with her on her regularly scheduled telework day i.e., to issue Ms. Millet a counseling letter even though the meeting invite stated Jones would be discussing Ms. Millet's focus areas. Jones told Millet that the letter involves her approaching employees. Ms. Millet refused to sign the letter when Defendant Jones presented it to her for signature. Defendant Jones wrote on the letter that Millet refused to sign and then provided Millet with a copy of the letter while her co-worker Ms. Scott looked on. After reading the letter on her own time, Ms. Millet

realized she had been accused of unprofessional conduct for her allege actions during the April 25, 2013 mid-year review meeting and for allegedly asking her co-workers about their interaction with Defendant Jones. The Letter also alleged Ms. Millet had been counseled on December 7, 2012 and again on March 19, 2013 regarding the duties of her position when in fact she was not counseled. Defendant Jones told Ms. Millet that the counseling letter would remain in her EPF for two (2) years and then it would be removed. She also told her that it would be used against her if there were other disciplinary actions taken against her in the future. Ms. Millet never questioned the two employees about their interactions with Defendant Jones. She wanted to know if Defendant Jones had been briefed on the IMD process and the procedures since she had given Ms. Millet incorrect instructions about packaging one of her assigned IRMs. Looking through the EEO records Ms. Millet discovered that Defendant Jones questioned Ms. Carver after the April 24 meeting she had with her to inquire about the nature of their discussion. Ms. Carver did not confirm she had been questioned by Ms. Millet about her interaction with Defendant Jones. Ms. Millet had not been counseled on December 7, 2012 or March 19, 2013 nor was she unprofessional during the April 24 mid-year meeting. Ms. Millet submitted her rebuttal the same on May 7 refuting the allegations contained in the counseling letter.

30.    On May 10, 2013, Ms. Millet received an e-mail from Defendant Jones directing her to report to the office. Defendant Jones claimed she scheduled three meetings for Tuesday, May 14, 2013 that she wanted Ms. Millet to attend which included a meeting with her so that she could re-issue Ms. Millet the counseling letter she issued her on May 7. May 14 was Ms. Millet's regularly scheduled telework day.

31.    On May 14, 2013 Ms. Millet attended one of the three meetings because the second meeting the team Ms. Millet worked with all agreed there was no need to meet on their program

issues because there were no issue needing a discussion. The meeting Ms. Millet attended was Defendant Jones' regularly scheduled staff meeting that Ms. Millet regularly attended via conference call. It ended at 9:45 lasting only 26 minutes. Ms. Millet waited around for nearly two (2) hours to meet with Defendant Jones who disappeared for nearly four (4) hours. No one knew where she was. Ms. Millet discussed leaving the office and returning home to telework for the remainder of her day situation with Angela Cook who regularly acts on Defendant Jones's behalf when she is on leave or otherwise out of the office after she had waited around the office for more than two (2) hours for Defendant's Jones return. Ms. Cook did not see a problem with Ms. Millet's plan to return home to finish her day teleworking. At or about 11:50 a.m. Ms. Millet sent Defendant Jones an e-mail that she was returning home to telework for the remainder of her workday and then she left the office to return home. After Millet arrived home she discovered she had received messages from Defendant Jones on her home phone at 1:43 p.m. on her cell phone at 1:45 p.m. and later found out Defendant Jones had sent Ms. Millet an e-mail at 2:11 p.m. that day. Defendant Jones also left a message on Ms. Millet's phones that she would have to report to the office the very next day (May 15) to meet with her to receive the reissued counseling letter that she had planned to give her. The phone messages and e-mail pretty much stated the same things which was that Ms. Millet was being placed on AWOL for the remainder of the day for leaving the office without permission. Ms. Millet immediately returned to the office to address her absence and the AWOL issue. Defendant Jones and Ms. Millet met. Defendant Jones reissued Ms. Millet a new counseling letter dated May 14, 2013 changing only a date that Defendant Jones incorrectly stated in the May 7, 2013 counseling letter. Defendant Jones said to Ms. Millet "We don't have to like each other, we're here to get the work done and get it out" and "scheduling meetings outside FMP for a personal issue is okay but I have to be accountable for you and where you are, who you are going to meet with, and what type of leave

18

you're taking." Defendant Jones was referring to Ms. Millet leaving the office to meet with a

TIGTA Agent, even though Millet had informed her, verbally and in writing, of where should

was going.

32.    On May 14, 2013 Ms. Millet was charged 1.5 hours AWOL for leaving the office

without alleged permission and returning home to telework for the remainder of the day even

though Jones (initially) and I agreed to me making up time by staying later that day. At no point

had Ms. Millet been absent  without  permission; it was her scheduled telework day. Ms. Millet

was harmed by this action when her pay was docked 1.5 hours AWOL in her time and

attendance record.

33.    On May 15, 2013 Ms. LaRue responded to Ms. Millet's May 14 e-mail with a threat of

disciplinary action for insubordination if she continued to copy her on e-mails complaining about

being harassed. LaRue instructed Millet to work through the chain of command. On or about

May 2013 Ms. Millet initiated a formal EEO Complaint.

34.    On December 23, 2013 Ms. Millet received an email from Defendant Jones stating she

wanted to meet with her not later than January 17, 2014 to go over her commitments for the

second time even though she had already shared Ms. Millet's commitments on November 17,

2013. No other employees were copied on the email Jones sent Ms. Millet. Defendant Jones

canceled the January 2014 meeting when Ms. Millet after she responded on December 23 that

she was clear what was expected of her concerning her responsibilities and commitments items.

Ms. Millet also shared with Defendant Jones that she found the November 17, 2013 commitment

meeting to very stressful unproductive and humiliating and I didn't understand why Defendant

Jones wanted to meet again especially since there were no room for negotiating the commitments

Defendants Jones and Maglin forced on her.

35.    On April 24, 2014 Ms. Millet met with Defendant Jones to discuss her FY 2014 mid-year assessment. The mid-year assessment contained inaccurate negative and false information that Ms. Millet objected to. Ms. Millet sent Defendants Jones and Maglin an e-mail with a copy of her Matters-of-Concerns document and a copy of her previously submitted mid-year self-assessment as attachments to her rebuttal. Neither Defendant Jones nor Defendant Maglin considered the documents Ms. Millet submitted in support of her rebuttal.  The appraisal remained unchanged.

36.    On May 8, 2014, at Ms. Millet's last hour at work before starting her vacation Defendant Jones summoned Ms. Millet to her office where she issued her a Letter of Admonishment dated May 8 with Defendant Maglin's signature affixed on the last page of the Letter   Defendant Jones charged Ms. Millet with "Failure to Follow Management's Instructions" even though Ms. Millet repeatedly send Ms. Jones emails that she had too much on her plate and could not physically take on any additional assignments. Ms. Millet was accused of allegedly not willing to work with her co-worker Scott Deherrera to develop a training schedule for two (2) one-hour training sessions per month for the Office of Financial Management Policy. On May 8, 2014 Ms. Millet submitted a rebuttal disputing the charge of unprofessional conduct and failure to complete the training assignment. Ms. Millet did not have prior experience creating training classes and was not a member of Defendant Jones training staff. She was assigned to accounting policy where her primary responsibility was packaging IRMs. Ms. Millet's condition of employment was forever changed.

37.    On May 27, 2014 Defendant Jones Issued Ms. Millet a notice proposing a two-day suspension from July 10-11, 2014 in the presence of (Black Female) April Winfree-Daniels CFO Chief of Staff.  Ms. Millet was accused of being unprofessional during a mid-year meeting she

had with Defendant Jones on April 24, 2014. The proposal cited Title 5, Part 752 of the Code of

Federal Regulations which addressed promoting the efficiency of the Service and 5 CFR

2635.705(a) which addressed the "Use of Official Time." Defendant Maglin wrote in the letter

that he reviewed the regulation content and that he considered it applicable. t was Defendant

Jones who had acted unprofessional during that April 24 meeting. She was agitated, belligerent,

loud and intimidating when Ms. Millet tried to get to the bottom of why Defendant Jones would

write such inaccurate and false content in her mid-year appraisal review. Ms. Millet acted

professional during the entire meeting. Defendant Maglin did not initiate any investigations into

Defendant Jones' allegations nor did he provide Ms. Millet with enough evidence to support a

charge of unprofessional conduct. On June 17, 2014 Ms. Millet submitted a written response to

the proposed action. Ms. Millet challenged the assertion that she had engaged in unprofessional

conduct during her April 24 mid-year review meeting. Because the May 27th Proposal also cited

past instances on which corrective action had been taken against Ms. Millet (May 7, 2013

counseling letter that was reissued on May 14, 2013; May 8, 2014 Admonishment Letter) she

had previously rebutted those actions too. Ms. Millet also addressed the assertions of an allege

witness Ms. Scott who supposedly wrote a statement that Ms. Millet had been loud during the

April 24 meeting when she was not in the vicinity when the mid-year assessment review took

place. Ms. Millet provided statements from her co-workers (Black Female) Angela Coleman and

(Black Female) Yvonne Weathers that neither employee saw anyone else in the office at the time

(after 4:00 p.m.) Ms. Millet met with Ms. Jones. Every employee had left for the day. By letter

dated June 27, 2014, the two-day suspension was sustained by Gregory Kane, Deputy Chief

Financial Officer. Ms. Millet was supposed to be suspended on July 10-11, 2014 but July 11 was

her regularly scheduled day off based on her alternate work schedule. As such she only lost one

day's pay. Neither Defendant Maglin nor (White Male) Gregory Kane (Defendant Maglin's supervisor) initiated an investigation into Defendant Jones' claim. Defendant Maglin and Mr. Kane was aware that they relied on a fraudulent unsigned document allegedly received by Ms. Ms. Scott who claimed she overheard Ms. Millet speaking in a loud voice during the April 24 meeting even though she had already left for the day. Ms. Millet was not provided her due process rights nor was she allowed to provide her oral reply to Mr. Kane. Mr. Kane relied on a transcript that Defendant Maglin ordered for Ms. Millet's oral reply. Labor Relations Specialist Hattie Logan in her June 4, 2014 e-mail response to Ms. Millet's June 4 email about her oral reply date stated that "the Oral Reply request was due by COB June 3, 2014 and that waiting on her to provide the materials relied upon does not extend the due date" even though IRS policy confirms the time does not start to run on requesting an oral reply until after the material relied upon had been received and reviewed by the employee.

38.     On October 28, 2014 Ms. Millet received an unjustifiably low and negative annual performance appraisal rating. Leading up to the October 28, 2014 meeting there some was back-and-forth correspondence between Defendant Jones and Ms. Millet about who would attend her FY 2014 annual appraisal meeting. Ms. Millet was not agreeable to having a third-party present during her annual appraisal assessment meeting. Initially, Ms. Winfree-Daniels, CFO Chief of Staff was to attend Defendants Jones and Maglin's recommendation, but Ms. Millet objected to her presence. Ultimately, Defendant Maglin attended the meeting even though to Ms. Millet's knowledge he had never attended an annual performance appraisal meeting with any of the nearly three hundred (300) employees under his leadership. Ms. Millet noted during the meeting that she did not agree with the "Met" rating given to her for her FY 2014 performance because she believed she exceeded her performance based on the quality of her work assignments. Ms.

Millet submitted a written rebuttal of her annual appraisal rating where she stated that the rating did not sufficiently address her accomplishments, nor did it relate to each performance aspect. Ms. Millet made the assertion that it was apparent Defendants Jones and Maglin (who was the approving official of Ms. Millet's performance review) had not considered her self-assessment even though she listed each of her accomplishments in furtherance of her eight commitments and thereby concluding that her performance warranted an "Exceed" rating and not the Met rating Defendants Joan and Maglin gave her. Ms. Millet did not complete any additional assignments due to her large inventory of work. She did not have enough time.

Throughout her FY 2014 rating period Ms. Millet would request Defendant Jones guidance on many of her assignments since many of them she had not prior experience or training on how to do them. Defendant Jones always gave Ms. Millet the same response i.e., she was a GS-14 employee and expected to figure things out on her own. Ms. Millet provided documentation to Defendants Jones and Maglin supporting her reason why she deserved a higher rating, but it was not considered.

39.    Defendant Jones never observed Ms. Millet performance, nor did she review any of her completed assignments. She relied on her staff to review Ms. Millet work.

40.    On October 28, 2014 Ms. Millet received her annual commitments for FY 2015 which included duties beyond those of her position of record. Initially Ms. Millet and Defendant Jones met on October 28 to discuss her new commitments. Ms. Millet disagreed with Defendant Jones contention that the Debt IRM, the Debt Collection Program and the Tuition Assistance Program were all one commitment as opposed to being in three separate commitments. The HCO policy is that managerial officials' commitments should be limited to a critical few (not more than five (5) and should be single-level commitments. There were a lot of back-and-forth e-mails from

Defendant Jones and Ms. Millet regarding Ms. Millet's FY 2015 Commitments before they were finalized. One commitment in particular Ms. Millet questioned Defendant Jones about was the FM IMD coordinator commitment noting she wasn't sure of her responsibilities since Ms. Scott and Ms. Carver were also IMD Coordinators. Defendants Jones and Maglin told Ms. Millet that she was being assigned as the point of contact person for Financial Management (FM) and that she must maintain the status of each FM IRM which was already Ms. Carver's responsibility. Defendant Jones brought up the commitment of Ms. Millet developing a communication plan. Ms. Millet reminded Ms. Jones that Mr. Deherrera had been drafting the Plan more than a year earlier and Ms. Scott also drafted a communication plan two years earlier and was not sure why it was now being reassigned to her. Defendant Jones told Ms. Millet that Mr. Deherrera was no longer responsible for the plan. She also told Ms. Millet she would be responsible for the Tuition Assistance Program (TAP) that was assigned to Mr. MacDermid (GS-13 Accountant). Ms. Millet noted the extent of what she knew was not enough to manage a TAP and questioned Defendants Jones and Maglin why she was being assigned GS-13 work and had been since March 19, 2010 even though she was being paid at the GS-14 rate, but they provided no valid response other than to order Ms. Millet to meet with Mr. MacDermid to be trained by him.

41.     In or about November 2014 another manager (Louis Malfait) went to Ms. Millet's manager to seek additional time to respond to her request for information even though she established the due date to respond to her. As part of Ms. Millet's duties as the FM IMD Coordinator she was responsible for sending IRMs to be reviewed by Directors in FM. Mr. Malfait took issue with the amount of time he was given to provide a response. Instead of contacting Ms. Millet directly to ask for more time, he contacted Defendant Jones who subsequently made an issue of it. Later that day after raising the issue of the time, Defendant

Jones instructed Ms. Carver to respond to Mr. Malfait request for more time. Mr. Malfait sent a subsequent message to Ms. Millet indicating that he would try to meet the deadline which he did. Ms. Millet believed Malfait went to Jones as to make trouble for her.

42.    Between September and November 2014 Ms. Millet did not receive notification of vacancy announcements for positions within the CFO organization. She was not a recipient of the vacancy announcements sent out by Ms. Anita Davis on September 15, 17, 22, October 28, and November 13. Ms. Millet believed that Defendant Maglin had instructed Ms. Davis to remove Ms. Millet's name from the Employee Distribution List in a deliberate attempt to prevent her from applying for CFO vacancy announcements. The excuse Ms. Davis provided to the EEO Counselor Jeff Gross that Ms. Millet incorporate by reference was that Ms. Millet's name was removed from the group e-mail distributions list (that she created) when she was suspended for one day (on July 10, 2014). Ms. Millet noted that in August 2014 she received one vacancy announcement e-mail from Ms. Davis and in September 2014, she received two (2). Then she stopped receiving these e-mail messages from her.  Ms. Millet was harmed by management's action in that she was not allowed the opportunity to compete for other positions within the IRS.

43.    On November 17, 2014 Ms. Millet along with Defendant Jones and Ms. Cook received an e-mail message from Melissa Alvarez, Chief Austin Payroll asking them to review a revised debt letter to ensure that the new version of the letter didn't change or remove any of the legal requirements. Defendant Jones then forwarded the e-mail message to Nancy Hutchison a Beckley Finance Center manager who oversaw the CFO's Travel Program asking her to work with Ms. Millet to review the letter. In response Ms. Millet informed Defendant Jones that she felt disrespected and uncomfortable with the fact that she sent her an e-mail message informing her she had assigned Ms. Hutchison a BFC manager to work with her on the Debt Collection

Demand Letter that another BFC manager Bonnie Buchanan was responsible for since she oversaw the CFO's Debt Collection Program. Ms. Millet felt that Defendant Jones should have discussed the matter with her beforehand. Ms. Millet consistently reminded Defendant Jones that she had no legal authority nor was a debt collection attorney or otherwise well-educated in debt collection laws. Ms. Hutchinson was not an attorney she was a Supervisor who managed the Travel program for the CFO.

44.     On January 8, 2015 Defendant Jones initially denied Ms. Millet's request for ad hoc telework day and made several demands of her. On January 8, 2015 at 7:28 a.m. Ms. Millet sent Defendant Jones an e-mail informing her that her car would not start due to the cold weather. Ms. Millet asked for an *ad hoc* telework day so that she could perform her duties. Defendant Jones responded to Ms. Millet's e-mail at 9:36 a.m. instructing her to find someone to assist her with her car because she wanted Ms. Millet at work to attend a scheduled meeting that she knew nothing about beforehand. At 9:46 a.m. Ms. Millet responded to Defendant Jones e-mail informing her that she had already tried to get someone to start her car but there was no one to start it for her. At 10:17 a.m. Defendant Jones responded to Ms. Millet's e-mail approving her for telework that day. Later that morning Defendant Jones sent Ms. Millet an e-mail message regarding the items she wanted to discuss with her that day. She requested that Ms. Millet make necessary updates to the Debt Collection IRM and to provide her with a draft copy by January 27, 2015. Ms. Millet responded that the deadline was unreasonable, and she would only commit to providing a status update within 30 calendar days since Defendant Jones always gave her unreasonable deadlines to complete her so-call ad hoc assignments. Defendant Jones also questioned Ms. Millet as to why she had not sent a copy of the BFC first demand letter to Ms. Alvarez along with the second demand letter since they both needed to be revised. Ms. Millet

responded that she had not been involved with drafting the first demand letter and, therefore did not have a copy of it to send. Ms. Millet responded to Jones' e-mail noting that she had requested copies of the demand letter from two different individuals one individual never responded and the other took a month to respond. Ms. Millet also noted that Defendant Jones had given her inconsistent instructions on January 8th and on January 21st regarding the Debt IRM.

45.    Defendant Jones directed Ms. Millet to draft an Interim Guidance document to be completed by February 15, 2015 citing Ms. Cook and Ms. Scott as being available to assist her. Subsequently, by e-mail dated February 11, 2015, Defendant Jones directed Ms. Millet to provide her the Interim Guidance no later than February 24, 2015.

46.    On January 27, 2015 Defendant Jones failed to respond to and confirm approval of Ms. Millet's request for *ad-hoc* telework due to the inclement weather in the DMV areas. Ms. Millet received a metro communication via e-mail that Federal agencies were open under a two-hour delayed arrival with the option for unscheduled leave or unscheduled telework provided that affected employees seek approval from management. Ms. Millet sent Defendant Jones an e-mail message stating that due to the inclement weather she was requesting to telework that day. That evening Ms. Millet sent another message to Defendant Jones indicating she had not received a response from her approving her request to telework. The following day Defendant Jones responded to Ms. Millet e-mail indicating that since telework had been authorized by OPM she did not think she needed to approve Ms. Millet's request. Ms. Millet found this to be odd since on January 6, 2015 and February 14, 2014 Ms. Millet requested *ad hoc* telework due to inclement weather as well for Defendant Jones to approve her requests which she did soon after the requests were submitted.

47.    Ms. Millet's is subject to a more extensive review of her work than other employees in your unit specifically about the review of the Collections and Deposits IRM. Ms. Millet noted that since starting work on the Collections and Deposits IRM in 2012 the document had been reviewed and commented on several times. During the period September 25, 2014 to January 8, 2015 Defendant Jones had other employees inside the unit and outside her work unit review the IRM. Ms. Millet received invitations to meetings organized by BFC employees to discuss the IRM. Ms. Millet and Ms. Buchanan exchanged a series of e-mail messages regarding why there was now this additional review of the IRM by BFC employees especially since many BFC employees reviewed the IRM each time Defendant Jones sent it to them for review and comment. Ms. Millet and Ms. Buchanan exchanged e-mail messages regarding a request for a clean copy of the IRM. Ms. Millet explained to Defendant Jones when she got involved that she had not sent Ms. Buchanan a "clean copy" of the IRM noting that the practice is to only send a clean copy to the BFC Coordinator. Ms. Millet also noted there had been discussion about Ms. Davis' comments about the IRM including that it was not in the proper structure and format. Ms. Millet also noted that Ms. Davis had previously reviewed the IRM on two occasions and had never made any such comment to her. Ms. Millet questioned the necessity and value of this additional review and she questioned the propriety of the demands made on her to provide a clean copy of the IRM as such was contrary to prior established practice. Ms. Millet noted that she had previously submitted the IRM to the BFC on seven occasions in addition to Defendant Jones' submissions. Each time BFC wrote back to inform Ms. Millet that the subject matter experts had no comments. Defendant Jones contacted the BFC Director to inform him that his staff had no comments on the IRM. After speaking with the BFC Director Defendant Jones began forwarding the IRM to more BFC employees asking them to review and comment on the

IRM. Ms. Millet did receive comments from BFC employees some of which were erroneous or unintelligible which led to Ms. Millet to not accept them. Ms. Millet provided BFC with written feedback as to why she accepted or did not accept each comment. Ms. Millet characterized this extensive review process as Defendant Jones way of attempting to hold up the publication of the IRM which to date have not been published. Ms. Millet also explained to Defendant Jones why she had not sent Ms. Buchanan a "clean copy" of the IRM noting that the practice is to only send a clean copy to the BFC Coordinator. Ms. Millet also noted that she did not feel comfortable with the process developed by Mr. Deherrera through his process improvement plan. She felt that his method was not better than the IRS established process and that there were no evident to support that his plan worked. Ms. Millet noted that discussion with the reviewers would have required her to reduce that conversation and those comments to writing because those comments needed to be made a part of the file. She did not feel that to be the best use of time nor the most cost-effect way to develop an IRM.

48.     Unlike her coworkers Ms. Millet was not provided constructive feedback or guidance from Ms. Jones and she mainly interacted with her by e-mail. In Ms. Millet's January 8, 2015 e-mail message to Defendant Jones in response to her directions regarding updating the Debt Collection IRM and her questioning why Ms. Millet did not send Ms. Melissa Alvarez a copy of the first demand letter along with a copy of the second demand letter Ms. Millet stated that she found it "problematic and very condescending" that she is always told what to do how to do it and when to do it. Ms. Millet noted that her coworkers are given full autonomy to work their projects in the manner they choose and are asked when they will be able to complete their projects rather than being told when to complete them. In a February 11, 2015 e-mail message to Defendant Jones Ms. Millet recounted the events of a recent February 10th meeting. She noted in

the e-mail message that Jones continues to harass her trash her work saddles her with at will projects and fabricate things she supposedly said. In the Record of Investigation (ROI) which Ms. Millet incorporate by reference "Mr. DeHerrera indicated that all of Defendant Jones' employees struggle due to her poor leadership and her lack of support and direction given to subordinates. Mr. Deherrera stated that he feels Defendant Jones has treated Ms. Millet worse than other employees, particularly about her holding on to Ms. Millet's IRMs for extended periods of time. Mr. Deherrera also noted that Defendant Jones does not have regular, day-to-day conversations with Ms. Millet like she does with other employees." In the ROI, which Ms. Millet incorporate by reference "Mr. MacDermid indicated that he received zero support and guidance from Defendant Jones about his work drafting IRMs. Mr. MacDermid indicated from his discussion with employees Policy Office employees is that they too received little if any guidance from Ms. Jones and that it negatively impacts their ability to complete assignments on time. Mr. MacDermid stated that on several occasions during the weekly staff meetings Defendant Jones has spoken to Ms. Millet in a rude manner. Mr. MacDermid stated that it is the exception rather than the rule that Defendant Jones speaks to him in a civil ton. He also noted that that she gives him unrealistic deadlines to complete assignments."

49.     On February 27, 2015 Defendant Jones assigned Ms. Millet as the overall Lead/POC for establishing policies and procedures for referring nontax delinquent debts to the Workforce Relations Division for discipline even though Ms. Millet told Ms. Jones she felt uncomfortable with the assignment. Defendant Jones expected Ms. Millet to coordinate efforts and communication between AWSS, the Financial Systems Office and BFC along with participating in all AWSS meetings and discussions. Defendant Jones also stated that Ms. Millet should also ensure that the Financial System Office and BFC are included in any meetings with AWSS that

are relevant to them. Additionally, Defendant Jones expected Ms. Millet to provide her with status updates. Ms. Millet feels Defendant Jones at will assigned her additional debt collection-related responsibilities even though Ms. Millet did not have a debt collection background. Ms. Millet has been included in debt collection meeting with AWSS and the National Finance Center at the request of Jones and that she has always just attended such meetings but never led one.

50.     After receiving the Exceed rating Ms. Millet asked Ms. Cook whether her rating qualified her for a performance-based award. Ms. Cook believed that Ms. Millet qualified for an award. Ms. Cook told Ms. Millet that the awards usually are issued in December but instructed Ms. Millet to wait until January 2012 because she wasn't sure of the timing. In or about January 2012 after Ms. Millet returned to work after her vacation she realized she had not received a performance award. She spoke with Ms. Anita Davis who told Ms. Millet that her name was not on the list for employees to receive an award. Ms. Davis indicated that it was up to Defendant Maglin as to who would receive an award even though her Supervisor Kathleen Downs had recommended Ms. Millet for an award and requested that she chose either a time-off award or a monetary award. Ms. Millet chose to receive a monetary award and signed the document indicating it when Ms. Downs presented it to her for signature. Although Ms. Millet received an overall rating of "Exceeds" on her appraisal for the period ending September 30, 2011 she did not receive a corresponding monetary award.

51.     Defendant Jones required Ms. Millet to use a specific form on which to report her monthly achievements/progress. Mr. Deherrera created a template to be used by each employee to identify the assignments on which they were acting on, the status of those assignments and any challenges they faced in completing those assignments. Defendant Jones claimed the document as her own during one of her regularly scheduled staff meetings after she had already told me to

31

use it a month earlier when I met with her to discuss the status of my work assignment. Defendant Jones told the employees that the document would be used to assist her in keeping track of the tasks on which her employees are working. Ms. Millet felt the created template would not provide enough detail on the status of her assignments. She opted to use an Outlook Calendar to report every action she took on each assignment during the prior month especially since Defendant Jones micromanaged every action Ms. Millet took on her assignments this way she thought Defendant would have it all. Ms. Jones told Ms. Millet not to use the monthly calendar and directed her to use the template created by Mr. Deherrera not her as she claimed in the ROI which Ms. Millet incorporates by reference.

52.    Ms. Millet's coworkers and not her manager reviewed and commented on her work. In or about August 30, 2013 Ms. Millet learned that her coworker Mr. Deherrera was reviewing her IRMs and providing feedback to Defendant Jones. Ms. Millet stated that she was told by Defendant Jones that she was the one who prepared her feedback. Ms. Millet characterized Mr. Deherrera' s as harsh and intimidating and as a personal attack on her technical skills and on her personally. He had only been employed by the IRS for three months when he reviewed Ms. Millet's work. Ms. Millet was assigned three (3) IRMs to develop in FY 2013 two (2) of which had never been created. Ms. Millet found it difficult to create IRMs without training and without Defendant Jones' guidance feedback and monitoring the IRM process. She also stated that Defendant Jones provided constant feedback to Ms. Carver. Ms. Millet only received feedback from Mr. Deherrera and Ms. Scott, neither of whom was a subject matter expert and both of whom were with the Agency for less than four months when they were assigned to review Ms. Millet's IRM. In the EEO records which Ms. Millet incorporates by reference she stated "that Mr. Deherrera was on a 5-person Team

32

that reviewed the Collections and Deposits IRM that Defendant Jones assigned to Ms. Millet. As such, Ms. Millet's work on that IRM would have been reviewed by the team, including Mr. Deherrera and Ms. Scott.

53.    Defendant Jones engaged in actions that negatively impacted Ms. Millet's work on the General Administrative Accounting (GAA) IRM and the Collections and Deposits IRM. Ms. Millet stated that she had asked Defendant Jones when she would be providing her with feedback on the IRM she had written. Defendant Jones could not recall having received the document but promised she would look for it. Mr. Deherrera indicated that he had the IRM and the he had been reviewing it at Defendant Jones direction. Ms. Millet submitted her first draft of the Collections and Deposits IRM in 2011. Her then manager Ms. Downs felt it was a good first draft and that led to Ms. Millet earning an exceeds on her performance appraisal. When Ms. Millet submitted her second draft in August 2011 Ms. Downs kept it and upon her retirement on August 30, 2012 gave it to Defendant Jones.

Based on Ms. Downs' comments Ms. Millet updated the document and submitted it to Defendant Jones along with the GAA IRM. In December 2012 Defendant Jones indicated she wanted additional information in the IRM a decision with which Ms. Millet disagreed with the type of content she wanted in the document. The IRM content covered administrative procedures for running the IRS. Ms. Millet later submitted the GAA IRM for review and comment in April 2013. Ms. Millet asserted that the comments provided to her from Mr. Deherrera were incorrect and that Defendant Jones made it a requirement that she use his "Draft Conceptual Plan" for preparing to write an IRM despite this not being a requirement of any of her coworkers at the time. She also asserted that in December 2013 that she provided Ms. Jones with four options for a Table of Contents asking that

she pick the one that best suited the CFO's purpose, but Defendant Jones never got back

to Ms. Millet with her choice even after Ms. Millet followed up with Defendant Jones

about choosing a table of content for the GAA IRM. Ms. Millet even suggested that Ms.

Jones discussed the matter with Defendant Maglin as it would be his call as to what table

of content to use. Still Defendant Jones did not provide her option.

54.     In her EEO declaration, which Ms. Millet incorporate by reference, Ms. Cook

confirmed that in or about October 2013 she had been told by Defendant Jones that she

would no longer be designated as Acting Manager in Defendant Jones's absence and that the

reason for this was that Ms. Cook told Ms. Millet that Ms. Scott was reviewing her

Collections and Deposits IRM.

**B.     Pervasiveness of Discrimination, Harassment and Retaliation at the CFO**

55.     The CFO has a history of engaging in permitting and condoning discrimination and

harassment against black female employees and retaliating against them when they oppose or

report Discrimination in the workforce. Far from being isolated incidents, the accounts of

multiple witnesses demonstrate that Ms. Millet's experiences are part of a longstanding and

continuing pattern of race-based discrimination harassment and retaliation against Black female

employees who resist or oppose discrimination in the workforce. Ms. Millet has been subject to

unprofessional and condescending behavior by her first-level supervisor Defendant Jones an

increased workload counseling letter admonishments one-day suspension criticism over minutia

and other unwarranted disparate harassment because of her race and/or EEO activity. The

harassing treatment began in 2007 and is still ongoing today. Despite Ms. Millet's frequent

attempts to improve her working relationship with Defendant Jones she has refused to treat Ms.

Millet in a respectful manner. Furthermore, Defendant Jones's conduct toward Ms. Millet in the

performance of her duties frequently put her in a position where she was destined to fail especially considering Defendant Jones's propensity to overload Ms. Millet with work and to criticize minutia. Additionally, Ms. Millet was repeatedly singled out to be scrutinized by Defendant Jones and she was the only one whose work was subject to an additional level of review. Ms. Millet subjectively was embarrassed intimidated and felt threatened by Defendant Jones and Defendant Maglin's actions towards her. Further Ms. Millet suffered from unnecessary and elevated levels of stress due to the conduct of Defendants Jones and Maglin. Considering the totality of the circumstances, the Agency's harassment clearly rises to  the level of severe and pervasive given the frequency of the harassment, the fact that the harassment invaded all aspects of Ms. Millet's (*i.e.* her ability to perform her duties and her performance rating) and the fact that it affected the terms and conditions of her employment over a sustained period during the last seven (7) plus years.

**C.    Conclusion**

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF TITLE VII
### (Race Discrimination)

56.    Ms. Millet herby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

57.    Ms. Millet came to realize she had been discriminated against in February 2013 when she spoke with Ms. Schlak about her work-related issues. It was not until March 2013 that she came to suspect that the negative actions to which she had been subjected to in the past were acts of discrimination including the fact that she had been demoted by Defendant Maglin when raised the issue of (White Female) Ms. Leroux unprofessional behavior to him. When Ms. Millet requested to be reassigned out of the hostile environment, Defendant Maglin demoted her. Even

then Ms. Millet had not connected the dots that she had been discriminated against. What she did

know that she had been treated differently from the White employee. Ms. Millet did not know

enough to make the determination that she had been discriminated against. There were no

postings around the office about what to do if an employee suspected discrimination. Although

Ms. Millet did not suspect discrimination at the time, she knew that she had been treated

differently than the White Female employee Ms. Leroux. A White employee harassed Ms. Millet

made complaints against her. Ms. Leroux's complaint resulted in Ms. Millet White supervisors

demoting and reassigning her. Yet, when Ms. Millet raised her complaints of discrimination

against White supervisors her complaints were rejected, and nothing was done. Similarly, when

Ms. Millet and other Black employees requested telework their requests were denied and

delayed; yet White employees had their requests granted. Defendant Jones refused to have a

Black employee (Angela Coleman) act in her place and had an inexperienced, White employee

(Scott Deherrera) fulfill the role instead.  Defendant Maglin has made efforts to get rid of Black

employees (Ms. LaChristy). White employees (Ms. Wyman and Defendant Jones) came to work

late and are not given AWOL; Ms. Millet was given 1.5 hours of AWOL for traveling to and

from home on her telework day to attend meetings in the office. All these White employees also

to Ms. Millet's knowledge have not engaged in protected EEO activity. The responsible

management officials, Defendants Jones and Maglin became aware of the Complainant's race

and protected EEO activity prior to the alleged discrimination and harassment.

## COUNT 2

### VIOLATION OF TITLE VII
### (Harassment)

58.    Ms. Millet hereby incorporates all preceding paragraphs of this Complaint as if fully set

forth therein.

59.     Ms. Millet was subjected to ongoing harassment and adverse treatment as described in detail. Indeed, after engaging in protected activity by reporting and opposing discriminatory harassment, Agency management began a pattern and practice of subjecting the Complainant to continuous and ongoing harassment for having engaged in protected EEO activity, and/or due to her race. For a period of over approximately seven (7) years, and continuing until the present, Ms. Millet has been subject to discriminatory harassment because of her race and/or prior protected EEO activity. These examples of harassment are not isolated and invaded all aspects of her employment resulting in interference with the terms and conditions of her employment.

60.     Despite Ms. Millet's frequent attempts to improve her working relationship with Defendant Jones, Defendant Jones has refused to treat Ms. Millet in a respectful manner. Furthermore, Defendant Jones's conduct toward Ms. Millet in the performance of her duties frequently put her in a position where she was destined to fail, especially considering Defendant Jones's propensity to overload Ms. Millet with work and to criticize minutia. Additionally, Ms. Millet was repeatedly singled out to be scrutinized by Defendant Jones, and she was the only one whose work was subject to an additional level of review. Ms. Millet has been subject to unprofessional and condescending behavior by her first-level supervisor, Defendant Jones, an increased workload, admonishments, criticism over minutia, and other unwarranted, disparate harassment because of her race and/or EEO activity. The harassing treatment occurred on a regular basis for a period of over Seven (7) years.

**COUNT 3**
**VIOLATION OF TITLE VII**
**(Retaliation)**

61.     Ms. Millet realleged and incorporate by reference each allegation in the preceding paragraphs as if fully set forth herein.

62.    Defendant Jones retaliated when she told Scott Deherrera Financial Management

Analyst that Ms. Millet filed an EEO Complaint against her even though he had just started

working for Defendant Jones. Ms. Millet engaged in protected EEO activity on March 11, 2013,

when she contacted an EEO counselor to initiate the 2013 EEO Complaint. In addition,

Defendants Maglin and Jones learned of Ms. Millet's EEO activity the same month, March 2013.

The record is clear that the individuals responsible for engaging in retaliation had full knowledge

of Ms. Millet's protected EEO activity at the time they engaged in the retaliatory harassment.

63.    There is a clear nexus between Ms. Millet's engagement in protected EEO activity and

the Agency's adverse treatment, because the Agency's actions, for the most part, follow her

protected activity within a manner and period that a reprisal motive is inferred. Thus, very close

temporal proximity exists between Ms. Millet engaging in protected EEO activity and the

Agency's retaliatory adverse actions enough to establish the necessary nexus to demonstrate

reprisal discrimination regarding Ms. Millet's first initiated EEO contact in March of 2013, and

thereafter, the intensity of the harassment significantly increased. Prior to March of 2013, there

were a few discriminatory – but seemingly isolated – instances of Defendant Jones and Maglin

treating Ms. Millet differently than her co-workers, which Ms. Millet reported to Defendant

Maglin and Ms. LaRue in 2012. Ms. believed (and still believes) and complained to

management, including Defendant Maglin, Ms. LaRue, TIGTA and the IRS Commissioner that

the aforementioned incidents were because of her race; however, once Ms. Millet filed her EEO

complaint and Defendant Jones and Maglin became aware of the EEO activity, the frequency

and severity of her disparate treatment increased, escalating to the point where the Complainant

was taking sick leave to cope. This escalation of harassment and discrimination only served to

bolster Ms. Millet belief that her race and thereafter reprisal was motivated by unlawful intent.

The proximity between the Complainant's EEO activity and the adverse personnel actions sufficiently support a causal connection that the adverse action and ongoing harassment and discrimination was because of Ms. Millet's prior EEO activity.

65. Because of the Agency's discriminatory and retaliatory actions, Ms. Millet has suffered humiliation, embarrassment, psychological and emotional harm, emotional and psychological distress and damage to her career.

**D.    Plaintiff's Efforts to Combat the Discrimination**

64.    The Agency employees that engaged in unlawful harassment of D e f e n d a n t s Jones and Maglin were M s . M i l l e t ' s supervisors in her chain-of-command at the time of the harassment. Defendants Jones and Maglin knew early on that Ms. Millet perceived their behavior as discriminatory and harassing yet failed to take any remedial action and in fact fed the ongoing harassment. The Complainant repeatedly informed her supervisory chain including his first- second- and even fourth-level supervisor, TIGTA and the IRS Commissioner of what she believed to be inappropriate and discriminatory behavior on the part of Defendants Jones and Maglin, however, the situation was never addressed, and Ms. Millet's work situation remained unchanged. Therefore, there is a basis for imputing liability on the Agency for the severe and pervasive unwanted discriminatory harassment based on Ms. Millet's race and/or EEO activity.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Millet hereby demands and prays for the following:

1.    Declare that the practices described in this Complaint exist at the IRS and that they are unlawful;

2.    Issue a permanent injunction prohibiting Defendants, their officers, agents, employees, and successors from engaging in the discriminatory employment practices complained of herein;

3.    Award Plaintiff back pay, and other job benefits enough to redress the harms that she has suffered;

4.    Award Plaintiff compensatory damages enough to redress the harms that she has suffered;

5.    Award Plaintiff reasonable attorneys' fees and costs;

6.    Award any relief necessary to prevent future harassment and retaliation, and to ensure that harassment and retaliation complaints are fully and fairly adjudicated; and

7.    Award any other relief this Court may deem just and proper;

## **DEMAND FOR A TRIAL BY JURY**

Plaintiff requests a jury trial for all questions of fact raised by this Complaint.

**DECLARATION:**

I, Plaintiff Alfreda D. Millet declare under penalty of perjury that the information contained in this complaint is true to the best of my knowledge and belief.

Dated: April 29, 2019

Respectfully submitted,

Alfreda D. Millet
9803 Angora Drive
Cheltenham, MD 20623
(301) 782-7725
(301) 466-3926

*Attorney pro se*